UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TED KLIEMANN**,                                       Case No. 1:10 CV 1588

    Plaintiff,                              Judge John R. Adams

    v.                                              REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                              Magistrate Judge James R. Knepp II

**Introduction**

Plaintiff Ted Kliemann appeals the administrative denial of disability insurance benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405(g). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). For the reasons discussed below, the undersigned recommends the Commissioner's decision be affirmed.

**Procedural Background**

On September 13, 2006, Plaintiff filed an application for DIB alleging disability as of October 31, 2003. (Tr. 100-03). The Agency denied his claims initially and on reconsideration. (Tr. 74-76, 78-79). Plaintiff then sought a hearing before an Administrative Law Judge (ALJ).

Plaintiff's date last insured was December 31, 2007. (Tr. 24). After reviewing the evidence and holding a hearing, the ALJ found Plaintiff was not under a disability at any time from October 30, 2003 through December 31, 2007, because he could perform a significant number of sedentary jobs despite his impairments. (Tr. 10-20). The Appeals Council denied review, leaving the ALJ's decision as the final decision of the Commissioner. (Tr. 1-3). Plaintiff filed a brief in support of his

appeal. (Doc. 15). And Defendant has filed a brief in opposition. (Doc. 17).

**Factual Background**

*Medical Record*[1]

Plaintiff was 43 years old as of his alleged onset date, and 47 years old on the date last insured. (Tr. 18). He has a high school education and has past relevant work including work as an assembler and stockman. (Tr. 18, 60).

The earliest medical evidence in the record is from January 2006, more than two years after Plaintiff alleged he became disabled. In January 2006, Plaintiff saw Dr. Johnny Su for a follow-up concerning his rheumatoid arthritis. (Tr. 235). Plaintiff reported he had not had any flare-ups since his last visit, in October 2005. (*Id.*). He claimed his hands were stiff in the morning and that it lasted from one to two hours. (*Id.*). He told Dr. Su he began experiencing pain in his hands after he moved some furniture. (*Id.*). On examination, Dr. Su noted Plaintiff had mild tenderness, but no effusion or warmth, good range of motion in the knees and ankles, and no synovitis in his hand or wrist joints. (Tr. 236). Dr. Su concluded there was no evidence Plaintiff had active rheumatoid arthritis and it was well controlled by medication. (*Id.*).

In May 2006, Plaintiff returned to the rheumatology clinic for clearance for his upcoming shoulder surgery. (Tr. 222-25). Plaintiff told Dr. Arminda Lumapas he was doing fairly well, and he had done some grilling that weekend. (Tr. 222). He said he was on his feet for a long time and, although he had some swelling in his ankles, he did not have any pain. (*Id.*). Plaintiff reported he

---

[1]Plaintiff's arguments focus on the ALJ's consideration of Plaintiff's impairments in his hands, legs, and feet. (Doc. 15). Therefore the Court will likewise focus on these impairments, rather than Plaintiff's other impairments (such as chronic obstructive pulmonary disease and obstructive sleep apnea), about which there is no controversy.

2

had tingling in his feet for the past year. (*Id.*). Dr. Lumapas noted Plaintiff had ulnar deviation in both hands, but did not have any synovitis in his hand or wrist joints. (Tr. 223). She also noted Plaintiff had slightly decreased range of motion, but no effusion or warmth, in his knees and ankles. (*Id.*). She concluded Plaintiff's rheumatoid arthritis was stable. (*Id.*). A week later, Plaintiff had surgery on his shoulder. (Tr. 203-10).

In December 2006, Plaintiff had an x-ray of his left ankle. (Tr. 244). It revealed spurring at the back of the heel, but no evidence of fracture or dislocation. (*Id.*).

A week later, at the request of the Agency, Plaintiff underwent a consultative examination. (Tr. 245-47). Dr. Wilfredo Paras noted Plaintiff had a history of rheumatoid arthritis, but it appeared to be controlled with medication. (Tr. 245, 247). Plaintiff told Dr. Paras it only affected his left fingers in the beginning, but now affected his right hand, wrists, elbows, shoulders, ankles, and feet. (Tr. 245). He said in the last couple of years the arthritis had begun to affect his hips and knees. (*Id.*). He also complained of lower back and joint pain. (*Id.*).

On examination, Dr. Paras noted Plaintiff walked normally with no assistive device, had no edema or varicosities, normal pulses, no motor or sensory deficits, no muscle atrophy, and normal reflexes. (Tr. 246). Dr. Paras also noted there was no evidence of joint heat or swelling, and Plaintiff had normal posture. (*Id.*). Plaintiff's manual muscle testing showed his grasp, manipulation, pinch, and fine coordination were all normal. (Tr. 249-50). There were no muscle spasms or muscle atrophy, and the range of motion in his hands and fingers were normal. (Tr. 250-52). He had no problems picking up a coin, key, writing, holding a cup, opening a jar, operating a zipper, or opening a door. (Tr. 250). Dr. Paras concluded Plaintiff's ability to perform work-related physical activities was limited by his constant joint pain, which affected his hips, knees, ankles, and

feet. (Tr. 247). He commented that Plaintiff also had exertional dyspnea which might affect his ability to work. (*Id.*).

Two weeks later, Dr. W. Jerry McCloud reviewed Plaintiff's file. (Tr. 261). Dr. McCloud found Plaintiff could do medium work, but he should only occasionally climb ramps, stairs, ladders, ropes, and scaffolds. (Tr. 256). He noted this limitation related to Plaintiff's stiffness in his fingers. (*Id.*). He also noted Plaintiff could only frequently finger (fine manipulation). (Tr. 257). He concluded Plaintiff was not entirely credible, because physical examination did not support the severity of his complaints and functional limitations. (Tr. 259). Dr. McCloud noted his findings were not significantly different from the treating/examining source statement in the file. (Tr. 260).

In February 2007, Plaintiff had x-rays of his hands, wrists, feet, and ankles. (Tr. 263, 265, 267). The x-rays of his hands and wrists showed no significant change since 2003 and no radiographic evidence of inflammatory process. (Tr. 263). The foot x-rays were also stable. (Tr. 265). And the x-ray of his ankles showed no bony abnormality. (Tr. 267).

About a month later, Plaintiff had a consultation with podiatrist Dr. Jeffery Ali. (Tr. 270). Plaintiff complained he had an intense burning sensation in both of his feet. (*Id.*). He said it did not really bother him when he was walking, but he noticed it when he stopped. (*Id.*). Dr. Ali noted Plaintiff had some limited range of motion and hypersensation in his feet and ankles, but normal muscle strength in all groups. (Tr. 271). Dr. Ali advised Plaintiff to do home exercises and prescribed him a topical cream. (*Id.*).

In May 2007, Dr. Willa Caldwell reviewed Plaintiff's file. (Tr. 296). She agreed with Dr. McCloud's January 2007 opinion. (*Id.*).

Later in May, Plaintiff reported he stopped using the cream prescribed by Dr. Ali because

it caused his feet to burn. (Tr. 311). On examination, Dr. Howard's resident, Dr. Robert Crockett, noted no edema and Plaintiff's sensation was intact. (*Id.*). Dr. Crockett advised Plaintiff to continue doing stretching exercises. (Tr. 312).

In August, Plaintiff returned to the rheumatology clinic. (Tr. 372). He complained of more pain, stiffness, and cramping in his hands and calves. (*Id.*). He attributed these symptoms to the fact he had been doing a lot of heavy labor, including putting in a pool, carrying tents up and down a hill, and gardening. (Tr. 373). Nurse Giulianetti noted he walked to the treatment area without using an assistive device and was able to stand, sit, and get on the examination table independently. (Tr. 375). She also noted Plaintiff had no active synovitis, despite his claims of arm stiffness. (*Id.*). The following week, Plaintiff began complaining of pain in his left hip. (Tr. 371-72). He said it began after he moved four heavy bags of mulch. (Tr. 372). Nurse Helen Lintala noted his complaints and referred him to a clinic. (*Id.*).

A week later, Plaintiff returned to the rheumatology clinic, complaining he had low back pain for the past five days. (Tr. 370). He said he began experiencing the pain after lifting a heavy bag of mulch. (*Id.*). He said he had numbness on his left side, but no weakness. (*Id.*). Dr. Sally Namboodiri noted his strength, reflexes, and range of motion were normal. (*Id.*). She also noted his lumbar spine was non-tender to palpation and his straight leg raising was negative. (*Id.*). She advised him to follow-up with his primary care physician. (Tr. 371).

In September, Plaintiff reported his feet were a lot better since he started using shoe inserts and topical cream. (Tr. 361). He said the pain was a three out of ten, and he was not having any other problems with his feet. (*Id.*). Podiatrist Dr. Howard Kimmel noted Plaintiff had normal strength in all muscle groups and normal neurological functioning in his feet. (Tr. 364).

In October 2007, Plaintiff had an x-ray of his lumbar spine and hips. (Tr. 333-34). The spinal x-ray revealed degenerative disc disease, but his vertebral bodies and pedicles were intact and his alignment was satisfactory. (Tr. 333). His bilateral hip x-ray showed no significant arthritis. (Tr. 334).

Later that month, Plaintiff complained of more pain and stiffness in his ankles, calves, and feet. (Tr. 354). He said he was not doing any heavy labor, but was planning on shoveling snow in the winter. (*Id.*). He said he had constant burning since beginning to use arthritis medication. (*Id.*). Nurse Giulianetti again noted Plaintiff walked to the treatment area without using an assistive device, was able to stand, sit, and get on the examination table independently. (Tr. 357).

Two months later, in January 2008, Plaintiff had a follow-up with Dr. Campise in the podiatry clinic. (Tr. 347). Plaintiff reported the burning in his feet had gotten a lot better since he started using the shoe insoles and a topical pain relief cream. (*Id.*). Dr. Campise noted Plaintiff's sensation was intact, and he had full strength in all muscle groups. (Tr. 349-50). He advised Plaintiff to return in three months. (Tr. 350).

A few days later, Dr. Pioro completed a medical source statement about Plaintiff's physical capacity. (Tr. 321-22). Dr. Pioro opined Plaintiff could occasionally lift or carry fifteen pounds, and frequently lift or carry seven pounds. (Tr. 321) She noted these findings were based on the synovitis of Plaintiff's upper extremities due to rheumatoid arthritis. (*Id.*). She further opined Plaintiff could stand or walk for ten minutes at a time, for a total of two hours in an eight hour work day. (*Id.*). She noted this finding was based on Plaintiff's synovitis of the ankles and feet, osteoarthritis of the lumbar spine, and chronic lung disease. (*Id.*). Dr. Pioro further opined Plaintiff

6

could sit for 30 minutes at a time, for a total of six hours in an eight hour work day, and that he needed a sit/stand option and to elevate his legs. (Tr. 321-22). She also thought Plaintiff needed to rest during the day, and that he could rarely or never climb, balance, stoop, crouch, kneel, crawl, reach, push, pull, or perform fine manipulation. (Tr. 322). She found Plaintiff could occasionally handle, feel, and perform gross manipulation. (*Id.*). Because of Plaintiff's chronic obstructive pulmonary disease, she noted he had environmental restrictions. (*Id.*).

On the same day, Dr. Pioro examined Plaintiff. (Tr. 341). She noted his rheumatoid arthritis was well controlled with medication. (*Id.*). She also noted Plaintiff complained of pain in his hands, knees, and back after shoveling snow two weeks prior. (Tr. 343). Plaintiff's examination revealed no active synovitis, full range of motion in the shoulders, painless range of motion in the hips, no tenderness in the knees, and no sensory abnormalities in his hands. (Tr. 344). Plaintiff told Dr. Pioro he did all of the shopping and errands (using a regular shopping cart), and helped cook. (Tr. 343). He claimed he could not stand in line for more than fifteen minutes, he could occasionally handle objects weighing fifteen pounds, and frequently handle objects weighing seven pounds. (*Id.*).

In April 2008, Dr. Campise noted Plaintiff had normal strength in all muscle groups and his neurological system was intact. (Tr. 403). He assessed rheumatoid arthritis and paresthesia/neuropathy. (*Id.*).

In July 2008, Plaintiff said his feet started burning after he ran out of medicine, but they felt better once he refilled his prescription. (Tr. 443). Dr. Adam Macevoy noted Plaintiff's sensation and muscle strength were normal. (Tr. 446).

In September, Nurse Nancy Fisher requested a physical therapy consultation. (Tr. 409). She noted there were no activity restrictions or imaging reports that might impede Plaintiff's therapy.

(*Id.*). Two months later, Plaintiff began physical therapy. (Tr. 411-13). Physical therapist Maria Pomales noted Plaintiff had normal range of motion and strength in his hips, knees, ankles, and feet. (Tr. 411). She also noted his coordination, posture, balance (sitting and standing), and muscle tone were good. (Tr. 412). Plaintiff reported he had difficulty getting his socks on, but he did some cooking, helped with the dishes, played PlayStation, worked on the computer, and helped out in the garden. (Tr. 413). Ms. Pomales advised him to begin a home exercise program. (*Id.*).

In February 2009, a nurse practitioner noted Plaintiff's rheumatoid arthritis was well controlled with medication. (Tr. 485).

*Plaintiff's Testimony*

Plaintiff appeared with counsel at the administrative hearing, where he testified. (Tr. 23-44). Plaintiff claimed he could not work because he had pain in his feet and hands. (Tr. 26-27). He said the foot pain was "24/7". (Tr. 42). He said he was prescribed pain medication, which he did not take because it caused undesirable side effects. (Tr. 39). He said he would "deal with a little bit of pain in order to have a clear head". (*Id.*). He said that, in order to obtain relief, he would lie down or elevate his legs. (Tr. 42).

Plaintiff testified he spent seven hours a day sitting on the couch. (Tr. 33). But he shoveled snow in the winter, occasionally washed dishes and mowed the lawn, and did all the household shopping. (Tr. 33, 39, 41). He said he used an non-prescribed cane. (Tr. 35).

Plaintiff also testified he had pain in his lower back. (Tr. 43). He said the pain was on the right side and felt like a pinched nerve, but the doctors had not found anything. (*Id.*).

Plaintiff further testified he had pain in his hands. (Tr. 26). But he said he occasionally played PlayStation three to four hours a day, even though it hurt his hands. (Tr. 33).

8

*Medical Expert*

Dr. Richard Katzman testified as a medical expert. (Tr. 44-58). Dr. Katzman testified that Plaintiff's rheumatoid arthritis was a severe impairment (Tr. 44), and that he previously had Felty syndrome, characterized by an enlarged spleen, but it was now controlled with medication. (Tr. 44-45). Dr. Katzman testified Plaintiff was capable of a full range of sedentary work, and he could intermittently perform light work. (Tr. 51). In his opinion, Plaintiff had no limitations on fingering. (Tr. 53-54). He noted Plaintiff drove, typed, used a computer and calculator, and handled coins. (Tr. 53). Dr. Katzman testified, in his opinion, Plaintiff's subjective leg symptoms were far above what one would expect to find from the objective findings. (Tr. 54).

On cross examination, Dr. Katzman testified there was no support for Plaintiff's claim he needed to elevate his legs. (Tr. 57). He mentioned the doctors had not performed the necessary diagnostic tests to determine the cause of Plaintiff's foot symptoms. (*Id.*). He acknowledged Plaintiff had some pain, but said his complaints went beyond the objective findings. (Tr. 57-58). He said Plaintiff had heel spurs and some degenerative osteoarthritis, but "one had to look at his functioning", noting that Plaintiff was walking, driving, and going up stairs. (Tr. 58).

Vocational Expert (VE) Evelyn Sindilar also testified. (Tr. 59-70). She testified there would be jobs available to a hypothetical person with Plaintiff's RFC (as found by the ALJ). (Tr. 60-62).

**Standard of Review**

Reviewing the denial of DIB, this Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than

9

a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)). The court "may not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003). However, procedural errors can be a basis for overturning the decision of the Commissioner, even if that decision is supported by substantial evidence. *See Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

**Standard of Disability**

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(a) & (d). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). The Commissioner uses a five-step sequential evaluation process, found at 20 C.F.R. § 404.1520, to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

10

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers a claimant's residual functional capacity, age, education, and past work experience to determine if a claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## Discussion

*Plaintiff's Severe Impairments*

Plaintiff argues the ALJ committed reversible error because he did not find paresthesia/neuropathy and ulnar deviation and synovitis of the hands were severe impairments. (Doc. 15, at 10-14).

At step two of the sequential analysis, an ALJ determines whether a claimant's impairments, individually or in combination, are severe. 20 C.F.R. § 404.1520(a)(4)(ii). The regulations do not require the ALJ to designate each individual impairment as "severe" or "non-severe". *Id.* Rather, the severity standard at step two is a threshold inquiry, and as long as a claimant has at least one severe impairment or combination of impairments, the ALJ must proceed beyond step two and

consider all impairments at the remaining steps of the evaluation process. 20 C.F.R. § 404.1523. Thus, if the ALJ finds a claimant has at least one severe impairment, the only remaining issue is what limitations, if any, result from the combination of impairments. *See Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007) ("When an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two does not constitute reversible error.") (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

In this case, the ALJ found Plaintiff had several severe impairments, and then proceeded through the sequential analysis. Thus, the ALJ followed the correct legal standard, and, as explained below, the ALJ reasonably accounted for all of Plaintiff's impairments in his residual functional capacity (RFC) analysis.

*RFC Finding – Plaintiff's Hands*

Plaintiff claims his ulnar deviation and synovitis of the hands were so severe they limited his ability to lift, handle, finger, and perform fine and gross manipulation. (Doc. 15, at 12). In support of his argument, Plaintiff cites two medical opinions more restrictive than the ALJ's RFC finding. (Doc. 15, at 12-13). But Plaintiff ignores he testified that he mowed the lawn, occasionally washed dishes, did all the shopping for himself and his wife, shoveled snow in the winter, and played video games on his PlayStation for sometimes as long as three to four hours at a time. (Tr. 33, 34, 39, & 41). As the ALJ noted, on several occasions Plaintiff told his doctors he was "doing heavy labor" including putting in pools, carrying tents up and down a hill, and gardening. (Tr. 373). He also admitted to carrying four bags of heavy mulch (Tr. 372) and moving furniture (Tr. 235). These activities show Plaintiff retained relatively good use of his hands. Given this evidence, it was

entirely reasonable to find Plaintiff was not as limited in the use of his hands as he alleged. (Tr. 15).

Not only were Plaintiff's activities inconsistent with someone suffering from disabling hand limitations, but the objective medical evidence failed to show significant abnormalities. Although Dr. Pioro noted in her assessment form that Plaintiff had synovitis (Tr. 321), there were several notations in the record noting Plaintiff did not have active synovitis in his upper or lower extremities (Tr. 223, 236, 281, 301, 344, 375, 402, 436, & 484), and his rheumatoid arthritis was well controlled with medication (Tr. 236, 247, 341, 345, 397, 402, 437, & 485). Dr. Paras noted his manual muscle testing showed his grasp, manipulation, pinch, and fine coordination were all normal. (Tr. 249). There were no muscle spasms or muscle atrophy, and the range of motion in Plaintiff's hands and fingers were normal. (Tr. 250-52). Plaintiff had no problems picking up a coin or key, writing, holding a cup, opening a jar, using a zipper, or opening a door. (Tr. 250).

After reviewing all the medical evidence and listening to Plaintiff's testimony, Dr. Katzman testified that, in his opinion, Plaintiff did not have any limitations with respect to fingering. (Tr. 54). Dr. Katzman acknowledged Plaintiff had arthritis, but said the ALJ had to look at his functioning. (Tr. 58). Dr. Katzman concluded Plaintiff could perform a full range of sedentary work, despite his various impairments, and he could intermittently perform light work. (Tr. 52).

Plaintiff's activities, combined with the objective medical evidence and Dr. Katzman's testimony, provided substantial evidence for the ALJ to find Plaintiff could perform sedentary work without additional hand limitations.

*RFC Finding – Plaintiff's Legs*

Plaintiff also argues the ALJ should have found greater limitations, including a need to elevate his legs, based on paresthesia/neuropathy. (Doc. 15, at 13).

While there were notations of paresthesia/neuropathy in the record, the ALJ noted there were no EMG studies indicating Plaintiff had the condition. (Tr. 17). Dr. Katzman testified that even though doctors noted Plaintiff had problems with his feet they had not performed the necessary diagnostic tests. (Tr. 57). In his opinion, Plaintiff's complaints were "far above" what one would expect from the objective findings (Tr. 54), and there was no objective evidence in the record requiring Plaintiff to elevate his legs (Tr. 57). Given Plaintiff was never tested for paresthesia/neuropathy, it was reasonable for the ALJ to not list as a separate impairment or find as part of the RFC the need to elevate Plaintiff's legs.

In addition to the objective medical evidence, the ALJ also relied on Plaintiff's activities, which he found inconsistent with someone suffering from disabling leg limitations. At the hearing, Plaintiff claimed he had to elevate his legs for seven hours a day. (Tr. 33). Yet he admitted he shopped for groceries, worked on projects at home, and occasionally mowed the lawn. (Tr. 34, 39). Dr. Katzman testified that while Plaintiff had some pain, he still walked, drove, and went up and down the stairs, and it was necessary to look at his overall functioning. (Tr. 58). There were also several notations on the record that Plaintiff performed exertionally demanding activities, such as moving furniture (Tr. 235), putting in a pool (Tr. 373), carrying tents up and down a hill (*Id.*), gardening (*Id.*), shoveling snow (Tr. 354), and carrying heavy bags of mulch (Tr. 370). As the ALJ noted, Plaintiff's activities showed he was not as limited as he claimed. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) ("The ALJ could properly determine that her subjective complaints were not credible in light of her ability to perform other tasks."). Given Plaintiff's fairly active lifestyle, it was reasonable for the ALJ to find he could at least do sedentary work, which involves mostly sitting. *See* 20 C.F.R. § 404.1567(a).

*Weight Given to Treating Physician*

Plaintiff argues the ALJ gave improper weight to his treating physician, Dr. Pioro. (Doc. 15, at 15-16).

An ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.927(d). In determining how much weight to afford a particular opinion, an ALJ must consider: 1) examining relationship; 2) treatment relationship – length, frequency, nature and extent; 3) supportability; 4) consistency; and 5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* Social Security Ruling (SSR) 96-2p. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Even if the treating physician's opinion is not entitled to "controlling weight," there is nevertheless a rebuttable presumption that it deserves "great deference" from the ALJ. *Id.* Importantly, the ALJ must give "good reasons" for the weight it gives a treating physician's opinion.

15

*Id.* Here, the ALJ reasonably found some of Dr. Pioro's imposed limitations were out of proportion to the objective findings and inconsistent with the record as a whole. (Tr. 17).

The ALJ agreed with Dr. Pioro that Plaintiff should avoid concentrated exposure to smoke, fumes, machinery, and heights. (Tr. 17). He also agreed with Dr. Pioro that Plaintiff was significantly limited in his ability to lift, stand/walk, sit, and climb. (*Id.*). Therefore, he limited Plaintiff to a range of sedentary work not involving climbing ladders, ropes, scaffolds, or exposure to concentrated smoke, fumes, dangerous machinery, or unprotected heights. (Tr. 13). But the ALJ did not agree with all of Dr. Pioro's limitations. (Tr. 17).

To the extent the ALJ did not adopt Dr. Pioro's limitations, he gave good reasons. One of the ALJ's primary reasons for not adopting Dr. Pioro's opinion regarding Plaintiff's hand limitations was that it was inconsistent with the record evidence. (*Id.*). Dr. Pioro based her findings that Plaintiff could not reach, push, pull, or do fine manipulation on the notion he had rheumatoid arthritis, and synovitis in the upper and lower extremities. (Tr. 322). But as the ALJ noted, there were several notations in the record that Plaintiff did not have active synovitis in his upper or lower extremities. (Tr. 223, 236, 281, 301, 344, 375, 402, 436, & 484). The record also contains numerous notations indicating Plaintiff's rheumatoid arthritis was well controlled with medication. (Tr. 236, 247, 341, 345, 397, 402, 437, & 485). Other limitations identified by Dr. Pioro are similarly inconsistent with other record evidence. She found Plaintiff could not stand/walk more than ten minutes at a time, sit more than 30 minutes at a time, could rarely or never climb, balance, stoop, crouch, kneel, and crawl, and needed additional breaks. (Tr. 321-22). She said she based these findings on Plaintiff's synovitis of the ankles, peripheral neuropathy, rheumatoid arthritis, and chronic lung disease. (*Id.*). As noted above, examinations did not show synovitis, and the treatment

16

records showed Plaintiff's rheumatoid arthritis to be well controlled by medication. Similarly, while Dr. Pioro noted neuropathy was an aggravating factor, the ALJ noted there were no diagnostic studies indicative of the disease. (Tr. 17). In fact, on the same day Dr. Pioro completed the medical assessment reflecting the extreme limitations, she noted Plaintiff had no active synovitis, full range of motion in his shoulders, painless range of motion in his hips, no tenderness in his knees, and no sensory abnormalities in his hands. (Tr. 344).

A further reason the ALJ provided for not crediting Dr. Pioro's opinion was that it was inconsistent with Plaintiff's testimony about his activities. (Tr. 17). As discussed above, Plaintiff shoveled snow, shopped, ran errands, did heavy labor, gardened, moved furniture, carried heavy bags, and put in pools. (Tr. 235, 343, 354, & 373). These activities demonstrate that Plaintiff's abilities exceeded Dr. Pioro's findings. The ALJ provided good reasons for according Dr. Pioro's opinion the weight he did.

*Hypothetical Relied On By ALJ*

Plaintiff argues the ALJ's hypothetical question did not accurately characterize Plaintiff's limitations. (Doc. 15, at 14-17). But this argument restates Plaintiff's challenge to the ALJ's RFC finding. As discussed above, the RFC finding was reasonably based on the record evidence including some portions of Dr. Pioro's assessment, Dr. Katzman's medical opinion, and the objective medical evidence. The ALJ was only required to include those limitations he found credible in his hypothetical. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact."). The ALJ's hypothetical question to the vocational expert accurately reflected his RFC finding.

17

(*Compare* Tr. 13 (RFC finding) *with* Tr. 60-61 (hypothetical given to VE)). Accordingly, Plaintiff's challenge to the hypothetical fails.

## Conclusion and Recommendation

Following review of the arguments presented, the record, and applicable law, this Court finds the Commissioner's decision denying DIB benefits supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).